**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Robbie Collins, | ) | Civil Case No. 2:23-cv-05736-RMG-MGB |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Nurse Johnson, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action has been filed by Plaintiff, *pro se* and *in forma pauperis*, pursuant to 42 U.S.C.

§ 1983, alleging inadequate medical care in violation of the Eighth Amendment and retaliation in

violation of the First Amendment. (Dkt. No. 10.) Before the Court is a Motion for Summary

Judgment filed by Defendant Renee Thompson, identified as "Nurse Thomas" in the Amended

Complaint (Dkt. No. 79);[1] a Motion for Summary Judgment filed by Defendants Kendra Davis

and Beverly Avila, identified as "Nurse Davis" and Nurse Avila" in the Amended Complaint

(Dkt. No. 82); and a Motion for Summary Judgment filed by Defendant Cathy Johnson, identified

as "Nurse Johnson" in the Amended Complaint (Dkt. No. 85). Pursuant to the provisions of Title

28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial

matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for

consideration. For the reasons set forth below, the undersigned recommends the Motions for

Summary Judgment be granted.

---

[1] Defendant Thompson asserts that Plaintiff's Complaint incorrectly identifies her as "Nurse Thomas." (Dkt. No. 79-1 at 1.) The undersigned refers to this Defendant by her correct name, Thompson.

## BACKGROUND

### A.     General Background

This action arises from events that occurred while Plaintiff was at Lee Correctional Institution ("Lee") in October of 2023. In his unverified Amended Complaint,[2] Plaintiff alleges that he suffered a "severe asthma attack" on October 13, 2023 while at Lee. (Dkt. No. 10 at 1.) Plaintiff alleges he was "rushed to medical" by correctional officers, and he received two "breathing treatment[s]." (*Id*.) Later that evening, while in lock-up, Plaintiff began to experience "excruciating body pains, shortness of breath, loss of smell, [and] rawness in [his] chest." (*Id*.) Plaintiff informed non-party "Sgt. Thompson" that he needed medical attention, and she brought non-party Nurse William to Plaintiff's door. (*Id*.) According to Plaintiff, "Nurse William told [him] to sign up for sick call and she would turn it in for [Plaintiff]." (*Id*.) Plaintiff "did a sick-call request right then and turned it in to her." (*Id*.)

The next morning, Plaintiff continued to experience "so much pain and [his] chest was hurting so bad" that he "wrote on a piece of paper to [non-party] Lt. Pressley" stating that he "had COVID or flu symptoms, severe body aches, chest was feeling raw, shortness of breath, and a massive headache." (*Id*.) Plaintiff alleges that Lt. Pressley brought Plaintiff's concerns to the medical team and came back with instructions from Defendant "Nurse Avila" to sign up for sick call. (*Id*.) When Plaintiff told Lt. Pressley that he had already given Nurse William his sick-call request, Lt. Pressley told Plaintiff there is "nothing more I can do." (*Id.*)

Plaintiff then asked Lt. Pressley if she could "tell them to come and swab [him] for COVID or the flu" and "get [him] some Tylenol . . . [for the] pain from the body aches" and because his

---

[2] While Plaintiff labeled his initial pleading a "Verified Complaint" (*see* Dkt. No. 1-1 at 1), it is not "sworn and submitted under penalty of perjury." *Goodman v. Diggs*, 986 F.3d 493, 495 (4th Cir. 2021) ("A complaint is 'verified' if it is 'signed, sworn, and submitted under penalty of perjury.'" (quoting *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020))).

"chest was hurting feeling like it was on fire." (*Id*. at 2.) Plaintiff alleges Lt. Pressley later came back with Defendant "Nurse Davis," and "Nurse Davis stated that she could hear [Plaintiff] wheezing" and "said she would come back and take [his] temperature and bring [him] some Tylenol." (*Id.*) Plaintiff alleges Nurse Davis never returned. (*Id.*)

Plaintiff next saw Defendant "Nurse Johnson" as "she was coming around passing out pill line meds." (*Id.*) When Nurse Johnson came to Plaintiff's door, Plaintiff told her he "had been sick as hell and in pain for days and nobody [was] trying to see [him]." (*Id.*) Plaintiff told Nurse Johnson he "was experiencing extreme body aches, shortness [of] breath, migraine headaches, vomiting, and [his] chest felt as it [sic] was raw and hurting." (*Id.*) According to Plaintiff, Nurse Johnson "heard [him] wheezing and struggling to breathe" and asked Plaintiff if he "sign[ed] up for sick-call." (*Id.*) When Plaintiff told Nurse Johnson he had given Nurse William his sick-call request, Nurse Johnson informed Plaintiff there was "nothing she could do." (*Id.*) Plaintiff asked Nurse Johnson for "some Tylenol." (*Id.*) Plaintiff alleges Nurse Johnson said she would bring him some back, but she "never did." (*Id.*)

"Later that night, Nurse William came and checked on [Plaintiff] by knocking on [his] cell door and asking did they come and check on [him]." (*Id.*) Plaintiff said they had not, and asked if she could help. According to Plaintiff, Nurse William "stated that she gave my sick call request to Nurse Thomas [Thompson] who was the Head Nurse and she should have seen [him] ASAP because she could see [he] was doing bad." (*Id.*) Nurse William told Plaintiff "she would let them know to come and check on [him] because it had been a week and [he] was still sick." (*Id*. at 3.) Plaintiff alleges nobody came to help. (*Id.*)

On October 20, 2023, Plaintiff wrote to Annie Rumler in the Office of General Counsel, telling her that he "was being denied medical attention" for his pain and asking for help. (*Id*.; Dkt.

No. 1-1 at 3.) The record shows that Plaintiff received the following response on October 26, 2023: "Your second letter regarding you experiencing pain and COVID symptoms has been forwarded to medical at your institution for handling." (Dkt. No. 1-1 at 7.) Plaintiff alleges he also "wrote a[n] Emergency Grievance and [he] never received any help and was left to suffer in pain for two weeks." (Dkt. No. 10 at 3.)

Plaintiff lists seven federal lawsuits he has filed in this district "against nurses at every level." (*Id.*) Plaintiff maintains that this is "an ongoing pattern with SCDC medical staff" refusing to treat his medical needs because of his numerous lawsuits against prison staff. (*Id.*) The undersigned construes the instant action as alleging inadequate medical care in violation of the Eighth Amendment and retaliation in violation of the First Amendment against Defendants Johnson, Avila, Davis and Thompson. (*See* Dkt. No. 13 at 1.)

Plaintiff filed this action on November 14, 2023, and he filed an Amended Complaint on March 7, 2024.[3] (Dkt. No. 10.) On April 29, 2025, Defendant Thompson filed a Motion for Summary Judgment. (Dkt. No. 79.) On May 9, 2025, Defendants Avila and Davis filed a Motion for Summary Judgment. (Dkt. No. 82.) On May 12, 2025, Defendant Johnson filed a Motion for Summary Judgment. (Dkt. No. 85.) On April 30, 2025, May 9, 2025 and May 13, 2025, this Court issued Orders pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the dismissal procedure and the possible consequences if he failed to adequately respond to the dispositive motions. (Dkt. Nos. 80; 83; 86.) Plaintiff filed a response in opposition to the Motions for Summary Judgment filed by Defendants Thompson and Johnson on June 2, 2025. (Dkt. No. 88.) That same day he filed a separate response in opposition to the Motion for Summary Judgment

---

[3] On February 4, 2025, Defendant Thompson filed a motion to dismiss. (Dkt. No. 67.) The District Judge issued an Order on June 26, 2025, granting in part and denying in part the motion. (Dkt. No. 92.) Specifically, the Court granted Thompson's motion to dismiss as to Plaintiff's supervisory liability claim and denied her motion to dismiss as to Plaintiff's § 1983 claims for deliberate indifference and retaliation. (*Id.*)

filed by Defendants Avila and Davis. (Dkt. No. 89.) On June 9, 2025, Defendants Avila and Davis and Defendant Johnson filed separate reply briefs in support of their Motions for Summary Judgment. (Dkt. Nos. 90; 91.) Plaintiff filed sur-replies specific to the Motions for Summary Judgment filed by Defendants Johnson, Avila, and Davis on July 7, 2025. (Dkt. Nos. 94; 95.) The Motions for Summary Judgment are ripe for review.

### B.     Evidentiary Background

In support of their Motions for Summary Judgment, Defendants rely on their personal sworn affidavits; Plaintiff's inmate search detail report; Plaintiff's medical records; Plaintiff's relevant grievance history; and Defendant Davis's October 2023 work schedule. In his opposition briefing, Plaintiff relies on his medical records; his submitted inmate requests; and Defendants' responses to his discovery requests. Because Plaintiff's Amended Complaint is not verified, it does not constitute admissible evidence at summary judgment. *See Thompson v. Hartsfield*, No. 5:17-CT-3262-FL, 2020 WL 5709247, at *4 (E.D.N.C. Sept. 24, 2020) ("Plaintiff's unverified complaint is not competent summary judgment evidence."); *Huff v. Outlaw*, No. 9:09-cv-00520-RBH, 2010 WL 1433470, at *2 (D.S.C. Apr. 8, 2010) ("[T]he law is clear that a plaintiff cannot rely on an unverified complaint in opposing a motion for summary judgment.").

Plaintiff arrived at Lee on September 28, 2023.[4] (Dkt. No. 79-2 at 6.) Plaintiff's medical record documents an "Emergency Visit" on October 12, 2023 wherein Plaintiff was "escorted to medical by security personnel via wheelchair" due to difficulty breathing. (Dkt. No. 85-2 at 7.) The nurse noted Plaintiff's diagnosis of asthma, administered a "duo-neb" breathing treatment,

---

[4] Public record shows that Plaintiff transferred from Lee to Lieber Correctional Institution on October 23, 2024, and he has not returned to Lee since that time. *See* https://public.doc.state.sc.us/scdc-public/inmateDetails.do?id=%2000290946 (last visited Oct. 31, 2025); *see also Charley v. Moore*, No. 6:14-cv-4591-BHH-KFM, 2015 WL 13734221, at *2 (D.S.C. Jan. 28, 2015) ("This court may take judicial notice of the SCDC public inmate database.").

and indicated that she would notify a healthcare provider of the emergency visit. (*Id.*) The record documents that Plaintiff was given a new Alvesco aerosol inhaler prescription on October 12, 2023. (*Id.* at 11.)

On October 25, 2023, Mr. Collins visited the "Psychiatric Clinic" for a "mental health follow-up and medication management" appointment. (*Id.* at 9.) During this visit, Plaintiff "expressed dissatisfaction with the level of care he has received from the medical team at McCormick CI and an ongoing lawsuit with them" and he "mentioned the need for a biopsy for lung and throat nodules." (*Id.*) Plaintiff was "referred . . . to medical about medical concerns" and "labs were ordered." (*Id.* at 12.) On October 26, 2023, Plaintiff received a comprehensive blood chemistry profile (CCP), lipid profile, a complete blood count with differential (CBC-W), and a hemoglobin AlC test. (*Id.* at 14–17.)

A "Chart Update-Clinical" for Plaintiff dated December 19, 2023 states, "Unable to see i/m for sick call due to security issues. Pemberton RN charge nurse made aware of issue and email sent to Thompson HCA." (Dkt. No. 79-3 at 30.) The record Plaintiff's "Sick Call" visit with Defendant Thompson on February 8, 2024, to address Plaintiff's "Uvula[5] nodules," and his complaint about "bumps on the thing that hanging down in my mouth." (Dkt. No. Id. at 28.) Thompson's notes from this visit indicate that she examined Plaintiff, educated him "on drinking warm water if it is more comfortable" and "informed [Plaintiff] to notify medical if he feels the uvula is worsening." (*Id.* at 29.) Thompson confirmed that appointments had been made "for ENT in February and EGO in March." (*Id.*)

The parties have provided the work schedule for Defendant Davis, showing the days and hours Davis worked in October of 2023. (Dkt. Nos. 82-2 at 1; 89-9 at 1.) Most relevant here, this

---

[5] "Your uvula is the little fleshy hanging ball in the back of your throat." Uvula, *Cleveland Clinic*, https://my.clevelandclinic.org/health/body/22674-uvula (last visited June 20, 2025).

record shows that Davis worked at Lee on October 13th and October 16th, but she did not work at Lee on October 14, 2023.

In her affidavit, Defendant Johnson avers that she was employed by MedFirst Staffing, LLC to work at Lee as a registered nurse in October of 2023. (Dkt. No. 85-2 at 1.) Johnson's "first recollection of interacting with [Plaintiff] was when he asked [her] if [she] was served with papers regarding this lawsuit while [she] was taking his vital signs in the medical office." (*Id*.) Johnson denies interacting with Plaintiff on the dates he alleges in his complaint and believes "he has [her] mistaken with some other nurse." (*Id*. at 2.)

According to Johnson, if Plaintiff had reported his symptoms to her as he alleges, she "would have advised him to submit a sick call request as required by policy" and if she "believed his symptoms required immediate attention, [she] would have called the medical office before resuming distributing medications." (*Id*.) Johnson avers that she "would not have told him that [she] would bring Tylenol to him as this would prevent [her] from distributing medications to other inmates." (*Id*.) Johnson further avers that she does "not take an inmate's temperature in their cells" and that, instead, "as with taking other vital signs," an inmate's temperature is taken "in the medical office." (*Id.*) Johnson avers, "[b]ased upon my training and experience as a registered nurse, the symptoms [Plaintiff] describes in his complaint are not sufficiently serious to require immediate medical attention and would not pose a significant risk to his health or safety." (*Id*.) She denies breaching "any standard of care" or acting "with deliberate indifference to any threat to [Plaintiff's] serious medical needs." (*Id*. at 4.)

In her affidavit, Defendant Thompson states she was employed by the South Carolina Department of Corrections ("SCDC") "as a nurse" at Lee during the events at issue. (Dkt. No. 79-3 at 1.) Thompson avers that she has "reviewed the Plaintiff's medical records regarding his

medical conditions" and he "has been seen and treated by SCDC medical personnel on multiple occasions." (*Id*.) Thompson states she "never denied Plaintiff medical treatment for COVID symptoms" and states that she treated Plaintiff "once on February 8, 2024." (*Id*. at 1–2.) According to Thompson, "the medical department never denied Plaintiff medical treatment or medications during his incarceration within the SCDC." (*Id*. at 2.) Thompson avers that she "was not deliberately indifferent to any of Plaintiff's constitutionally required needs," and she did not "unlawfully retaliate against him." (*Id.*)

## STANDARDS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In ruling on such a motion for summary judgment, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). Although the Court must "draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Sandlands C & D LLC v. Cty. of Horry*, 737 F.3d 45, 54 (4th Cir. 2013) (citing *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). "Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Combs v. Giddens*, No. 3:20-cv-563, 2023 WL 3352193, at *1 (E.D. Va. May 10, 2023 (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).

Because Plaintiff is representing himself, these standards must be applied while liberally construing his filings in this case. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## DISCUSSION

In her Motion for Summary Judgment, Defendant Thompson argues: (1) Plaintiff's § 1983 claims fail as a matter of law; (2) any § 1983 claims brought against Thompson in her official capacity are barred by the Eleventh Amendment;[6] (3) she is entitled to qualified immunity; and (4) Plaintiff's recovery of damages is precluded by 42 U.S.C. § 1997e(e). (Dkt. No. 79-1.)

In their Motion for Summary Judgment, Defendants Avila and Davis argue: (1) Plaintiff's § 1983 claims fail as a matter of law; (2) they are entitled to summary judgment based on the matters deemed admitted by Plaintiff due to his failure to respond to their Requests to Admit; (3)

---

[6] In his briefing, Plaintiff does not dispute that the Eleventh Amendment bars any claims brought against Defendant Thompson in her official capacity. Regardless, it is well settled that because SCDC is an arm of the State of South Carolina, any claims brought against SCDC employees in their official capacities are barred by the Eleventh Amendment. *See*, *e.g.*, *Rhoden v. S.C. Dep't of Corr.*, No. 4:17-cv-2537-HMH-TER, 2017 WL 9288217, at *3 (D.S.C. Oct. 4, 2017) (finding claims against prison warden in his official capacity should be dismissed because warden is entitled to Eleventh Amendment immunity), *adopted by*, 2017 WL 5494126 (D.S.C. Nov. 16, 2017), *amended*, 2017 WL 6032341 (D.S.C. Dec. 6, 2017); *Edwards v. Patell*, No. 4:06-cv-0748-HFF-TER, 2007 WL 2428548, at *8 (D.S.C. Aug. 21, 2007) (dismissing claims brought against defendant "employee of SCDC" in his official capacity); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . [and] is no different from a suit against the State itself.") (internal citation omitted); *Abebe v. S.C. Dep't of Corr.*, No. 0:09-cv-3111-MBS-PJ, 2010 WL 2991595, at *2 (D.S.C. July 2, 2010 ("As a state agency, SCDC is an arm of the State of South Carolina."), *adopted in part*, 2010 WL 3258595 (D.S.C. Aug. 16, 2010).

they are entitled to qualified immunity; and (4) Plaintiff has failed to exhaust his administrative remedies. (Dkt. No. 82.)

In her Motion for Summary Judgment, Defendant Johnson argues: (1) Plaintiff's § 1983 claims fail as a matter of law; and (2) she is entitled to qualified immunity. (Dkt. No. 85-1.)

The undersigned considers the parties' arguments below.

## A.    Merits of § 1983 Claims

As discussed above, the undersigned construes the instant action as alleging inadequate medical care in violation of the Eighth Amendment and retaliation in violation of the First Amendment against Defendants Johnson, Avila, Davis and Thompson. (*See* Dkt. Nos. 10; 13 at 1.) The undersigned considers these claims below.

### 1.    Deliberate Indifference

#### a.    Applicable Law

To establish a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must put forth facts sufficient to demonstrate that an official was deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022). A deliberate indifference claim has both an objective and subjective component. *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019). "That is, the plaintiff must demonstrate that the defendant prison official acted with 'deliberate indifference' (the subjective component) to the plaintiff's 'serious medical needs' (the objective component)." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

A medical condition is serious enough to satisfy the objective component if it has "been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citing *Scinto v. Stansberry*, 841 F.3d

219, 225 (4th Cir. 2016)). The subjective component has two subparts: "a plaintiff must show the prison official (1) had actual knowledge of the risk of harm to the inmate and (2) recognized that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Pfaller*, 55 F.4th at 445 (citing *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)) (internal quotation marks omitted).

While mere negligence is not enough, *id*. (citing *De'lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)), evidence of an official's "actual purposive intent" is not required, *id*. (citing *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013)). "Instead, deliberate indifference is most akin to criminal-law recklessness." *Id*.   "[S]o long as the official who knew of a substantial risk to inmate health or safety 'responded reasonably to the risk,' they cannot be found liable under the Eighth Amendment, 'even if the harm ultimately was not averted.'" *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). Indeed, an inmate's mere disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

### b.    Analysis

As recounted above, Plaintiff's deliberate indifference claim hinges on the alleged inadequate medical treatment Plaintiff received at Lee in October of 2023. As an initial matter, Defendants do not expressly dispute that Plaintiff's alleged severe "covid or flu symptoms" constituted a serious medical need, and the undersigned finds a genuine issue of material fact that Plaintiff has satisfied the objective component of his deliberate indifference claim. *See Collins v. Belzer*, No. 2:20-cv-3752-RMG, 2022 WL 1486003, at *4 (D.S.C. May 11, 2022) ("[E]xperiencing severe Covid-19 symptoms constitutes a serious medical need.").

11

Even assuming Plaintiff can establish the objective component of this claim, however, he has failed to establish a genuine issue of material fact that Defendants acted with deliberate indifference to his serious medical needs. Notably, Plaintiff relies almost entirely on his unverified allegations in his Amended Complaint and in his briefing to support his claims. Upon review, the Amended Complaint focuses on events that transpired after Plaintiff "had a severe asthma attack" and received two "breathing treatment[s]." (Dkt. No. 10 at 1.) Plaintiff alleges he received the breathing treatment at issue on October 13, 2023, but his medical record documents that Plaintiff received a "duo-neb treatment" for his asthma during an "emergency visit" on October 12, 2023. (Dkt. No. 85-2 at 6–7.) Plaintiff alleges that during the night, after being released from medical, he experienced "excruciating body pains, shortness of breath, los[s] of smell, [and] rawness in [his] chest." (Dkt. No. 10 at 1.)

Specific to Defendants Avila and Davis, the Amended Complaint focuses on their alleged conduct the morning after Plaintiff's "severe asthma attack." (*Id*. at 1–2.) According to Plaintiff, when he complained of his "covid or flu symptoms" to non-party Lt. Pressley, Lt. Pressley "went and called medical." (*Id.* at 1.) On her return, Lt. Pressley allegedly told Plaintiff that "Nurse Avila said sign up for sick call." (*Id.*) Plaintiff claims that Lt. Pressley agreed with Plaintiff that "they are suppose[d] to come and check on [him]," and he was "sweating profusely" as he was speaking with Lt. Pressley. (*Id*.) Plaintiff alleges that at some point that same day, Lt. Pressley returned to Plaintiff's "door" with "Nurse Davis," who "stated that she could hear [Plaintiff] wheezing." (*Id*. at 2.) According to Plaintiff, Davis told Plaintiff she would return to bring Plaintiff Tylenol and take his temperature, but she "never came back." (*Id*.)

As for Defendant Johnson, Plaintiff alleges she was the "next nurse" he saw. (*Id*.) According to Plaintiff, he spoke with "Nurse Johnson [as] she was coming around passing out pill

line meds." (*Id.*) Plaintiff alleges he described his symptoms to Johnson and told her he had signed up for sick-call. (*Id.*) Plaintiff alleges he asked Johnson for Tylenol. According to Plaintiff, Johnson told Plaintiff she would bring him back Tylenol, but she never did. (*Id.*)

Finally, Plaintiff alleges that "later that night," he spoke with Nurse William. (*Id.*) According to Plaintiff, Nurse William "stated that she gave [his] sick-call request to Nurse Thomas [Thompson] who was the head nurse and she should of seen [Plaintiff] ASAP because [Nurse William] could see [Plaintiff] was doing bad." (*Id.*) Plaintiff further alleges that he wrote a letter to the Office of General Counsel on October 20, 2023 describing his symptoms and lack of medical treatment. (*Id.* at 3.) The record shows that General Counsel then forwarded this letter "to medical at [Plaintiff's] institution for handling." (Dkt. No. 88-1.)

Specific to Defendants Davis and Johnson, even crediting Plaintiff's version of their alleged interactions, their failure to provide Plaintiff pain medication on one occasion each amounts to no more than negligence.[7] *Keating v. Meade*, No. 1:20-cv-550 (LO/TCB), 2021 WL 120944, at *5 (E.D. Va. Jan. 12, 2021) ("[C]ourts have repeatedly declined to find that a medical provider was deliberately indifferent to an inmate's medical needs when a plaintiff challenges the type and quantity of pain medication."); *Watson v. Doe*, No. 1:19-cv-1043, 2020 WL 1644346, at *2 (M.D.N.C. Mar. 5, 2020) (Plaintiff's only allegation against Defendant [ ] is that on one occasion he failed to send adequate medication with Plaintiff . . . . This allegation of a single instance of failure to send medication is insufficient to state a claim of deliberate indifference. At

---

[7] In his briefing, Plaintiff asserts that Defendant Johnson and Davis failed to provide him proper medical treatment on other occasions. (Dkt. Nos. 89 at 7; 95.) However, those unverified allegations are not in the Amended Complaint, and "Plaintiff cannot amend his amended complaint via a motion for summary judgment or response thereto." *Haendel v. Clark*, No. 7:17-cv-00135, 2018 WL 4473118, at *5 n.8 (W.D. Va. Sept. 18, 2018); *see also Cumpston v. Cent. Supply Co. of W. Va.*, No. 1:17-cv-61, 2018 WL 4855216, at *7 (N.D. W. Va. Oct. 5, 2018) ("[T]he Court will not allow [the plaintiff] to amend his complaint at this late stage to avoid summary judgment, especially when those facts where available to him at the outset.").

most, it would constitute only a showing of mere negligence."), *adopted sub nom. Watson v. Doe #1*, 2020 WL 1640022 (M.D.N.C. Apr. 2, 2020).

As for Defendants Avila and Thompson, Plaintiff relies on hearsay evidence to support his claims against them. "Hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Lyons v. City of Alexandria*, 35 F.4th 285, 290 n.4 (4th Cir. 2022) (citing *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)); *see* Fed. R. Evid. 801, 802. First, Plaintiff's assertion that non-party Lt. Pressley told him that Defendant Avila said Plaintiff should sign up for sick-call is hearsay within hearsay. These statements were made by declarants not testifying in court and are offered for the truth of the matter asserted in these statements. *See* Fed. R. Evid. 801(c). Similarly, Plaintiff's allegation that non-party Nurse William told Plaintiff she gave his sick-call request to Defendant Thompson is also a statement made by a declarant not testifying in court that is offered for the truth of the matter asserted. None of these statements are subject to any hearsay exceptions. *See* Fed. R. Evid. 803, 804.

Assuming *arguendo* that these hearsay statements are admissible in this case against Defendants Avila and Thompson, Plaintiff has still failed to establish deliberate indifference to his serious medical needs. As discussed above, the record shows that Plaintiff received a breathing treatment on October 12, 2025, and when he met with a mental health provider less than two weeks later, he did not mention any issues with covid or flu symptoms or the alleged lack of medical treatment of these conditions. Rather, Plaintiff focused on the "level of care" he received at his prior institution for his "lung and throat nodules." (Dkt. No. 85-2 at 9–10.) When Thompson treated Plaintiff on February 8, 2024, it was for Plaintiff's "uvula nodules." (Dkt. No. 79-3 at 28.) Plaintiff did not complain of any prior or current issues with covid or flu symptoms and the limited

14

medical record does not show that Plaintiff otherwise presented with such symptoms during this "sick visit" or at any other time while at Lee. There is no evidence that Plaintiff actually suffered at any point from the physical injuries he alleges.

The foregoing record, even construed in the light most favorable to Plaintiff, indicates at most negligence or differences in judgment between an inmate and medical personnel, which does not rise to the level of a constitutional violation. *Wright*, 766 F.2d at 849 (finding inadequate treatment due to negligence, inadvertence, or differences in judgment between an inmate and the medical personnel does not rise to the level of a constitutional violation); *Duncan v. Gordon*, Case No. 8:06-cv-396-MBS, 2007 WL 1031939, at *3 (D.S.C. Mar. 29, 2007), *aff'd*, 260 F. App'x 543 (4th Cir. 2007) (granting summary judgment on deliberate indifference claim where "[t]here is no evidence that Defendant nurses withheld any medical treatment in an effort to deliberately or recklessly ignore an excessive risk to Plaintiff's health"); *see also Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Aten v. Richland Cnty.*, No. 5:16-cv-03614-PMD-KDW, 2018 WL 4560572, at *8 (D.S.C. July 3, 2018) ("While Plaintiff makes numerous unverified allegations, those types of assertions are not sufficient to establish that genuine issues of material fact exist" to support a § 1983 claim for deliberate indifference to a serious medical need), *adopted by*, 2018 WL 4109608 (D.S.C. Aug. 29, 2018), *aff'd sub nom. Aten v. Wiggins*, 839 F. App'x 798 (4th Cir. 2021). Accordingly, Defendants Thompson, Johnson, Davis, and Avila are entitled to summary judgment on Plaintiff's deliberate indifference claim.

## 2. Retaliation

As noted above the undersigned has construed the Amended Complaint as alleging a First Amendment retaliation claim based on his assertion that there is an "an ongoing pattern with SCDC medical staff" refusing to treat his medical needs because of his numerous lawsuits against prison staff. (Dkt. No. 10 at 3.) Defendants assert in their Motions for Summary Judgment that this retaliation claim fails as a matter of law. (Dkt. Nos. 79; 82; 85.) Notably, Plaintiff does not respond to this argument in his briefings, and he appears to have abandoned this claim. *See Jones v. Danek Med., Inc.*, No. 4:96-3323-12, 1999 WL 1133272, at *3 (D.S.C. Oct. 12, 1999) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."). Nevertheless, the undersigned considers the retaliation claim here in an abundance of caution.

Where a plaintiff alleges that an act was taken in response to the exercise of a constitutionally protected right, the plaintiff must allege that (1) he engaged in "protected First Amendment activity, (2) [the defendant] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and [the defendant's] conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)). With respect to causation, a plaintiff must plausibly allege knowledge by the defendant of a plaintiff's protected activity as well as that the retaliation took place within some "temporal proximity" of that activity. *Id.* at 501; *see Germain v. Bishop*, No. TDC-15-cv-1421, 2018 WL 1453336, at *14 (D. Md. Mar. 23, 2018). A prisoner must present more than conclusory accusations of retaliation, and must provide facts that show the exercise of his constitutional right was a substantial factor motivating the retaliation. *See e.g.*, *Adams v. Rice*, 40 F.3d 72, 74–75 (4th

Cir. 1994); *Cochran v. Morris*, 73 F.3d 1310, 1318 (4th Cir. 1996). In the analogous Title VII retaliation context, the Supreme Court has found that the temporal proximity between a protected activity and an adverse action must be "very close" to *prima facie* establish the causation element when it is relied on exclusively. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

Upon review, the lawsuits identified by Plaintiff did not name any of the Defendants in this action, and these lawsuits lack the requisite temporal proximity between their filing and the alleged adverse actions in this case. Further, although the standard is an objective one, it bears noting that the alleged conduct by Defendants here did not prevent Plaintiff from filing further lawsuits.[8] *See Constantine*, 411 F.3d 474 at 500 (recognizing that a "plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment Activity"). Based on the foregoing, Defendants Thompson, Johnson, Davis, and Avila are entitled to summary judgment on Plaintiff's retaliation claim.

Alternatively, because they are government officials, Defendants are entitled to qualified immunity from civil damages so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Christian v. Magill*, No. 0:15-cv-03379-DCN, 2016 WL 4975020, at *6 (D.S.C. Sept. 19, 2016) (applying qualified immunity analysis to employees of the SVPTP). In other words, Defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). Here, because Plaintiff has not demonstrated that any

---

[8] *See, e.g.*, Case No. 2:24-cv-00737-RMG (filed Dec. 13, 2024), Case No. 2:24-cv-01208-RMG (filed March 12, 2024), 2:24-cv-03915-RMG-MGB (filed July 11, 2024).

Defendants violated his constitutional rights, Defendants likewise are entitled to a finding of qualified immunity as to Plaintiff's § 1983 claims.[9]

### B.      Exhaustion

Defendants further argue that summary judgment is warranted based on Plaintiff's failure to exhaust his administrative remedies.[10] (Dkt. No. 82 at 12–14.) Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Through the enactment of this statute, "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." *Booth v. Churner*, 532 U.S. 731, 741 (2001); *see also Porter v. Nussle*, 534 U.S. 516 (2002).

The purpose of the exhaustion requirement is twofold. First, it gives an administrative agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). Second, "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

Exhaustion is defined by each prison's grievance procedure, not the PLRA; a prisoner must comply with his prison's grievance procedure to exhaust his administrative remedies. *Jones v. Bock*, 549 U.S. 199, 218 (2007). An inmate's failure to "properly take each step within the

---

[9] Similarly, because Plaintiff has failed to sufficiently allege a violation of his constitutional rights, any supervisory liability claim fails as a matter of law. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (a supervisor can be liable where (1) she knew that her subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) her response showed "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between her inaction and the constitutional injury.); *Chennault v. Mitchell*, 923 F. Supp. 2d 765, 787 (E.D. Va. 2013) ("A supervisor cannot be held liable absent a constitutional violation by the people she supervised.").

[10] While only Defendants Avila and Davis argue failure to exhaust in their Motion for Summary Judgment, all Defendants pled this affirmative defense in their Answers. (*See* Dkt. Nos. 38 at 9; 51 at 6; 55 at 1.)

administrative process . . . bars, and does not just postpone, suit under § 1983." *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002); *see also Johnson v. Ozmint*, 567 F. Supp. 2d 806, 815–16 (D.S.C. 2008) (granting summary judgment on the plaintiff's § 1983 claims for failure to exhaust his administrative remedies with respect to those claims).

"Failure to exhaust is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Baxley v. Jividen*, 508 F. Supp. 3d 28, 46 (S.D.W. Va. 2020) (citation and internal quotation marks omitted). "However, if a defendant makes a threshold showing of failure to exhaust, the burden of showing that administrative remedies were unavailable falls to the plaintiff." *Id.* (citation and internal quotation marks omitted).

### 1.     Evidence

The SCDC grievance procedure is outlined in SCDC Policy GA-01.12 ("Inmate Grievance System"). (Dkt. No. 82-4.) Subject to certain exceptions, the Inmate Grievance System requires that inmates initially attempt to resolve grievances informally by "submitting a Request to Staff Member Form to the appropriate supervisor/staff within eight (8) working days of the incident." (*Id.* ¶ 13.2.) When submitting the Step 1 grievance,

> The grievance form must contain information about how, with whom, and when attempts were made to resolve the problem informally within eight (8) working days of the appropriate supervisor's signature date on the SCDC Form 19-11, "Inmate Request To Staff Member" (RTSM). The grievance also must contain a brief statement of the circumstances of the grievance, to include date and time, why the grievant believes s/he is entitled to relief, and a brief statement of the action(s) requested for which relief may be available through the grievance procedure. (NOTE: A copy of the RTSM must be attached to the Step 1 grievance form.)

(*Id.*)

If an inmate files a Step 1 grievance that does not involve criminal activity, the Warden is required to respond in writing within 45 days and advise the inmate of his right to appeal to the next level:

The Warden will respond to the grievant in writing (in the space provided on SCDC Form 10-5, Step 1), indicating in detail the rationale for the decision rendered and any recommended remedies. The grievant will also be informed of his/her rights to appeal to the next level. The Warden will respond to the grievant no later than 45 days from the date the grievance was formally entered into the OMS system by the IGC. The response will be served by the IGC to the grievant, within ten (10) calendar days, and the grievant will sign and date the response acknowledging receipt. The IGC will maintain the original grievance for the inmate's grievance file and a copy will be given to the inmate.

(*Id.* ¶ 13.5) The inmate may then appeal by filing a Form 10-5(a) Step 2 appeal to the Inmate Grievance Coordinator within five days of the receipt of the response. (*Id.* ¶ 13.7) The appeal is referred to the "responsible official" who is required to make a final decision within 90 days. (*Id.*)

According to the Policy, an emergency "encompass[es], but is not limited to, situations, actions or conditions in which a person's health, safety, or welfare is threatened or in serious danger." (*Id*. ¶ 14.1.) The inmate filing an emergency grievance bears the responsibility "to demonstrate the factors creating the substantial risk of personal injury or other serious and irreparable harm." *Id*. Once the Grievance Coordinator receives a grievance alleging an emergency, he will forward it to the Chief of the Inmate Grievance Branch "to determine if a substantial risk of serious harm is present and warrants the grievance being processed as an 'emergency.'" (*Id.*) If the grievance is treated as an emergency, "it will be forwarded immediately to the Warden if resolution of the issue(s) is within the Warden's capability to provide." (*Id*. ¶ 14.2.) The responsible officials must respond to the inmate within seven working days of receiving the complaint rather than the normal forty-five days.  (*Id.*) If the grievance is not seen as emergency, the Grievance Coordinator must note that in his response and treat the grievance "routinely . . . as if it were a normal grievance." (*Id*. ¶ 14.4.)

The record shows that Plaintiff filed a Step 1 Grievance on October 20, 2023, which he labeled "Emergency Grievance." (Dkt. No. 89-1 at 1.) In this grievance, Plaintiff claims that his

"covid and flu symptoms" have not been properly addressed, that he has "been suffering in pain since Friday 13" and "medical refuses to see [him]." (*Id.*) The grievance was returned to Plaintiff as "unprocessed" on October 27, 2023 with the following explanation:

> You will need to complete an RTSM to medical or have the officer in your dorm call medical if you need to be seen sooner. You also stated on your grievance that it was an Emergency. Your grievance was reviewed by the Regional Inmate Grievance Manager and it was determined not to be so as defined in GA 01.12 Inmate Grievance System. However, consistent with SCDC GA-01.12 Inmate Grievance System, if you deem necessary you may refile a grievance on the same issue indicating the advised corrections/requirements and it must be placed in the designated Grievance box no later than 11/2/23. Failure to meet the deadline may result in the grievance being finalized without a Warden's Decision (decision).

(*Id.*)

Plaintiff submitted an inmate request to "Programs" on December 5, 2023, complaining that he has been putting in a sick-call request "since Sept. 28" and he has not been seen yet. (Dkt. No. 89-2.) Plaintiff states his "condition is getting worse" and he asks for "help" to be "seen by medical." (*Id.*) The response to this request is dated December 5, 2023, and states, "I have contacted medical and given them your information." (*Id.*) Plaintiff submitted another Step 1 grievance on December 9, 2023, stating he was seen on December 8, 2023 "for an emergency visit" and his "condition is deteriorating." (Dkt. No. 89-3.) Plaintiff states he has "yet to be seen by sick call about [his] shoulder and [his] foot." (*Id.*) This grievance was returned to Plaintiff as "unprocessed" on January 23, 2024 because he failed "to provide an updated informal resolution . . . from Medical." (*Id.*)

### 2.    Unavailability of Administrative Remedy

"[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). In *Ross v. Blake*, the Supreme Court set forth three scenarios where the

administrative process is considered "unavailable": (1) the administrative process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the administrative process is so opaque that no ordinary prisoner can discern or navigate through the process; and (3) the "administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." 136 S.Ct. 1850, 1853–54 (2016).

The examples provided in *Ross* with respect to the first scenario indicate that a deficiency of this type would be systemic or widespread, or at least not isolated. *See Ross*, 136 S. Ct. at 1859 (giving the following examples of when an administrative remedy is a dead end: when a prison handbook directs inmates to submit their grievances to a particular administrative office, but in practice that office disclaims authority to consider them; or when administrative officials have apparent authority but decline ever to exercise it). With respect to the third scenario, *Ross* seems to require that, to prevail on an assertion that prison officials thwarted his efforts to exhaust, an inmate must be able to demonstrate something more than isolated negligence on behalf of prison officials. *Id*. at 1860 n.3 (citing cases where correctional facilities staff misled the inmate about the existence of a process or its rules; used threats or intimidation; or misled him into thinking he had done everything necessary to use the process).

To prove unavailability, the inmate must "adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure." *Graham v. Gentry*, 413 Fed. App'x 660, 663 (4th Cir. 2011). "The district court is 'obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials.'" *Zander v. Lappin*, 415 F. App'x 491, 492 (4th Cir. 2011) (quoting *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)).

### 3.     Arguments and Analysis

In their Motion, Defendants Avila and Davis argue that Plaintiff failed to exhaust his administrative remedies because he "failed to properly file his Step 1 Grievance and failed to file a Step II Grievance in this case." (Dkt. No. 82 at 13.) In response, Plaintiff asserts that when his "Emergency Grievance" was returned so that Plaintiff could submit "an informal resolution," Plaintiff "then filed a staff request to medical requesting to be seen at sick call for covid symptoms." (Dkt. No. 89 at 1.) That staff request is not in the record. Plaintiff cites section 3.6 of SCDC Policy GA-06-.04, which states that "[a]ll RTSM should be responded to within 45 calendar days from date of entry in the Kiosk."[11] According to Plaintiff, "being that medical never responded to [his] request, Plaintiff had to wait the 45 days before filing another grievance." (*Id.*)

Upon review, the inmate request and grievances in the record do not show that any prison officials improperly interfered in the grievance process or that the grievance process was otherwise unavailable to Plaintiff. *See Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011) ("[I]n order to show that a grievance procedure was not 'available,' a prisoner must adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure."). Here, the record shows that Plaintiff filed the instant action on November 14, 2023, approximately 19 days after receiving the response to his "Emergency Grievance" on October 27, 2023. Plaintiff's interpretation of SCDC Policy does not excuse his decision to file the instant action before proceeding with the grievance process. Indeed, the record indicates Plaintiff has never filed a Step 2 grievance about the issues underlying his claims in this action.

---

[11] Here, the Court takes judicial notice of SCDC Policy GA-06.04, Request to Staff Member. *See* SCDC Policy GA-06.04 (available at https://doc.sc.gov/sites/doc/files/Documents/policy/GA-06-04.pdf); *see Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (holding that a court may "take judicial notice of matters of public record").

Because Plaintiff filed this lawsuit before submitting a proper Step 1 grievance and a Step 2 grievance, he did not exhaust his administrative remedies prior to initiating this action. *See*, *e.g.*, *Inman v. Dewitt*, No. 5:19-cv-1880-JMC-KDW, 2020 WL 6276660, at *3 (D.S.C. June 25, 2020) (finding plaintiff failed to exhaust his administrative remedies because he "filed this lawsuit before receiving a response from his Step 2 grievance"), *adopted by*, 2020 WL 5015434 (D.S.C. Aug. 24, 2020), *aff'd*, 2022 WL 101937 (4th Cir. Jan. 11, 2022); *Wilson v. Givens*, No. 9:21-cv-00523-RMG-MHC, 2022 WL 2500356, at *3 (D.S.C. May 9, 2022) (finding "Defendants have clearly shown that Plaintiff failed to exhaust his administrative remedies prior to initiating this action" because Plaintiff filed his lawsuit before his Step 2 grievance was denied), *adopted by*, 2022 WL 2128548 (D.S.C. June 14, 2022); *Shelley v. Stirling*, No. 4:18-cv-2637-JFA, 2020 WL 1899496, at *3 (D.S.C. Apr. 16, 2020) (rejecting plaintiff's argument that he exhausted his administrative remedies simply "by filing the two grievances which he classifies as emergency grievances"; noting that because "SCDC policy states that if the grievance is not determined to be an emergency, the grievance will then be routinely processed through the system as if it were a normal grievance, . . . Plaintiff would still be subject to the initial requirements discussed above if no emergency actions were taken") (internal quotation marks omitted). Simply filing an emergency grievance, without more, does not exhaust an inmate's administrative remedies. *See Singleton v. Stirling*, No. 9:21-cv-03820-RMG-MHC, 2023 WL 4163262, at *4 n.4 (D.S.C. Mar. 31, 2023) ("[F]iling an emergency grievance appears to only fast-track the consideration of those grievances. . . . While this expedites the process by removing some steps (like the attempt at informal resolution), there is nothing in SCDC's Inmate Grievance System to suggest that all an inmate needs to do to fully exhaust his administrative remedies is file an emergency grievance."), *adopted by*, 2023 WL 4161176 (D.S.C. June 23, 2023).

For the foregoing reasons, the undersigned recommends Defendants are also entitled to summary judgment based on Plaintiff's failure to exhaust his administrative remedies.[12]

## **CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Motions for Summary Judgment filed by Defendants Thompson, Avila, Davis, and Johnson (Dkt. Nos. 79; 82; 85) be GRANTED and this action be dismissed in its entirety.[13]

IT IS SO RECOMMENDED.


November 17, 2025

Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

---

[12] Having recommended dismissal on the above grounds, the undersigned does not address Defendants' remaining arguments for dismissal. (*See* Dkt. Nos. 79; 82; 85.)

[13] In her Motion for Summary Judgment, Defendant Thompson summarily asks that the Court designate this action as a "strike" for "purposes of the Prison Litigation Reform Act" under 28 U.S.C. § 1915(g). (Dkt. No. 79-1 at 17.) However, "[i]f and when [Plaintiff] files a *future* motion to proceed IFP under § 1915(g), it will be up to *that* district court—not a district court who previously dismissed one of his suits—to go back, count dismissals, and determine for itself whether there are three that qualify as strikes under the terms of § 1915(g)." *Pitts v. South Carolina*, 65 F.4th 141, 146 (4th Cir. 2023). Accordingly, the undersigned makes no recommendation on this issue.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).